**Lolita PARKER, Plaintiff-Appellee,**

v.

**James Michael WILLIAMS, individually and as Chief Jailer, Macon County, Alabama, et al., Defendants,**

**Lucius Amerson, individually and as Sheriff, Macon County, Alabama and Macon County, Alabama, Defendants-Appellants.**

Nos. 86–7233, 86–7369.

United States Court of Appeals, Eleventh Circuit.

Sept. 20, 1988.

Baxley, Beck, Dillard & Dauphin, William J. Baxley, Joel E. Dillard, Charles Dauphin, Birmingham, Ala., for Amerson.

Gray, Langford, Sapp, Davis & McGowan, Edwin L. Davis, Tuskegee, Ala., Charles S. Conley, Montgomery, Ala., for Macon County.

Jerry B. Kurz, Hall & Kurz, Chicago, Ill., Griffin Sikes, Jr., Montgomery, Ala., James J. Friedman, Waukegan, Ill., for plaintiff-appellee.

Before HILL and JOHNSON, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

JOHNSON, Circuit Judge:

This appeal arises from a jury award of compensatory and punitive damages for liability under state tort law and 42 U.S.C.A. § 1983. We resume our consideration of this case after receiving a response to the question we certified to the Supreme Court of Alabama. 519 So.2d 442 (Ala.1987).

## I. Background

Lolita Parker spent the night in the Macon County jail after a bar scuffle in which she hit a woman on the head with a glass. The following morning, on July 1, 1984, the chief jailer, James Williams, offered to help Parker get home. Williams agreed to arrange for Parker's bond if she would pose nude for "Hustler-type" photographs. Parker undressed for Williams in the cell so he could check for any scars or marks on her body.

Williams arranged for Parker's bond. Although Williams had instructed Parker to meet him at a nearby store, she took a cab to a friend's house instead. Not long thereafter Williams, having learned Parker's location from the cab driver, knocked on the friend's door. Williams was still in uniform. He persisted when told that Parker was not there and eventually found her in the bedroom. Williams informed Parker that her bond had been revoked and she would have to return with him to the jail. They entered the cab, but Williams directed the driver to take them to Williams' house. Once inside his house, Williams raped Parker.

Williams was convicted of rape and kidnapping. Parker suffered post-traumatic stress disorder. She had difficulty finding work because her work experience was in sales and waiting tables and she now shunned crowded public settings. She had difficulty sleeping because she dreamt regularly of a man chasing her. Her desensitization was estimated to require two years of active therapy.

On June 28, 1985, Parker filed suit against former chief jailer James Williams, Macon County sheriff Lucius Amerson, Macon County itself, and the individual Macon County commissioners. The complaint alleged violations under Alabama tort law and 42 U.S.C.A. § 1983. The individual commissioners were dismissed as defendants, and trial was held February 3–6, 1986. The jury found the chief jailer, the sheriff, and the county all liable under both the state and the federal claims, and it awarded compensatory damages of $100,000. The jury additionally awarded punitive damages of $100,000 against the sheriff and the county.

Sheriff Amerson and Macon County appealed the jury verdict and the damages award. This panel heard oral argument in December 1986 and withheld judgment pending certification of the following question to the Alabama Supreme Court: "Whether the sheriff of a county may be considered an 'employee' of the county for purposes of imposing liability on the county under a theory of respondeat superior?" The Alabama Supreme Court has answered the certified question, the parties have filed supplemental briefs, and we now reconsider and decide this case.

## II. State Certification

The district court instructed the jury that both Macon County and sheriff Amerson could be liable on the state law claims if the jury found that Amerson had been grossly negligent or wanton in hiring and retaining Williams and that the gross negligence or wantonness was a proximate cause of Parker's injury. The jury consequently found for Parker and against sheriff Amerson and Macon County on the state law claims, while Williams was held liable on the state law claims by the court because of his prior criminal conviction for rape.[1] On appeal Macon County argues

---

1. The jury was not given an option as to Williams' liability on the state law claims. The jury verdict form posed the state law claim liability as follows:

2. Do you find for the plaintiff, Lolita Parker, on the issues involving her State Law claims?
ANSWER ———
    (yes or no)

that sheriff Amerson was not an employee for whose acts it could be vicariously liable. Sheriff Amerson argues that he was immune from liability as an agent of the state.

In answering our certified question, the Alabama Supreme Court has agreed with Macon County and sheriff Amerson. In pertinent part, the state supreme court held:

> A sheriff is not an employee of a county for purposes of imposing liability on the county under a theory of respondeat superior. A sheriff is an executive officer of the State of Alabama, who is immune from suit under Article I, § 14, Alabama Constitution of 1901, in the execution of the duties of his office.... That portion of § 14–1–6 [sic], Code of Alabama 1975, which purports to make a sheriff civilly liable for the acts of his jailer is unconstitutional under Article I, § 14, and Article III, § 42 of the Alabama Constitution of 1901.

*Parker v. Amerson,* 519 So.2d at 442–43. In light of the clarifications that an Alabama county does not employ its sheriff and that Alabama sheriffs are executive officers

---

of the state, we must now decide the issues raised by appellants.

■ The state law claims are easily decided. The Alabama Supreme Court's answer disposes of the state law claims raised in this case. Those claims based on section 14–6–1 are eliminated to the extent that Parker's interpretation of section 14–6–1 has been expressly deemed unconstitutional. Amerson is not liable as the employer of Williams because state law holds him immune from suit. Macon County cannot be vicariously liable as the employer of Amerson because they shared no employer-employee relationship. Williams, who is not appealing, remains liable on the state law claims.

■ The federal claims require more extensive discussion. All defendants in this case were sued in both their official and individual capacities. We hold that sheriff Amerson is not liable in his official capacity on the federal claim. As decreed by the Alabama Supreme Court, Amerson is covered by state immunity and we conclude that he is protected from official liability under section 1983.[2] Although Amerson is

---

If your answer is yes, indicate, as to each defendant in the space provided with a yes or no.

| Yes | No | |
|-----|-----|-----|
| ( ) | — | James Michael Williams |
| ( ) | ( ) | Lucius Amerson |
| ( ) | ( ) | Macon County, Alabama |

2. Eleventh Amendment immunity is generally decided by reference to state law. *Harden v. Adams,* 760 F.2d 1158 (11th Cir.1985); *see also Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) ("depends, at least in part, upon the nature of the entity created by state law"). We are, however, mindful that state judicial and legislative declarations may guide but not direct a federal court's interpretation of a federal statute. *Mancini v. Lester,* 630 F.2d 990, 994–95 (3d Cir.1980); *Hampton v. City of Chicago,* 484 F.2d 602, 607 (7th Cir.1973) ("A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.").

In this regard it is significant that Eleventh Amendment immunity is based in part on respect for the financial integrity of the states.

"[A] § 1983 action ... may not include a retroactive award which requires the payment of funds from the state treasury." *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 1144, 59 L.Ed.2d 358 (1979); *see also Fincher v. State of Fla. Dept. of Labor,* 798 F.2d 1371, 1371 (11th Cir.1986) (significant are "the state's degree of control over the entity, and the fiscal autonomy of the entity"); *Williams v. Bennett,* 689 F.2d 1370, 1376 (11th Cir.1982) ("If the judgment necessarily will be paid from the state treasury, and the state is the real party in interest, then the state may invoke its sovereign immunity."). It is this financial focus that has generated the distinction between official and individual liability. *Gamble v. Florida Dept. of Health & Rehab. Servs.,* 779 F.2d 1509, 1513 (11th Cir. 1986) ("Whether a state officer is being sued for damages in an official or an individual capacity is not mere semantics; the question is whether the plaintiff is reasonably seeking relief from the state coffers or from the individual's assets.")

It is not part of the record before this Court, and the parties have not argued, whether damage awards against Alabama sheriffs in their official capacities are drawn from the pockets of the state or the county. To the extent that the Alabama Supreme Court in *Parker* extended traditionally recognized sovereign immunity,

protected in his official capacity, he could nonetheless be sued in his individual capacity. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). State immunity does not protect Macon County from section 1983 liability. *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890). We discuss the county's and the sheriff's federal claim liability in turn.

**A. Macon County's Section 1983 Liability**

In 1978, the United States Supreme Court departed from precedent and held that local governing bodies could be sued directly under section 1983 for monetary damages for constitutional deprivations. *Monell v. Department of Social Services of New York City*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* expressly rejected respondeat superior theories of liability as bases for section 1983 claims against municipalities. Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694. *Monell* also said that an act can satisfy the causation requirement of section 1983 municipal liability when it "involves official policy as the moving force of the constitutional violation." *Id.* Although the *Monell* outline gave little contour to the scope of official policy or the moving force requirement, many courts over the last decade have given fuller expression to what constitutes municipal liability under section 1983.

To incur liability under section 1983, Macon County must be causally linked to and at fault for the constitutional deprivation.

The jury in this case had before it two possible predicates for section 1983 liability against Macon County: (1) that sheriff Amerson in hiring Williams without conducting a reasonable background investigation was acting pursuant to an official policy or established custom on behalf of Macon County, or (2) that sheriff Amerson, as the ultimate authority in employment matters for the jail, was grossly negligent in hiring and retaining Williams. If in accord with the applicable legal standards, the jury's determination of liability under section 1983 must stand if supported by substantial evidence. *Manufacturing Research Corp. v. Graybar Elec. Co.*, 679 F.2d 1355 (11th Cir.1982).

As a preliminary matter, we have no difficulty concluding that Parker's rape was caused by Amerson's hiring and training of Williams as Macon County's chief jailer. The record shows that Williams had a history of mental problems and was a convicted sex offender. In 1975, Williams underwent voluntary treatment at the East Alabama Mental Health Center. In 1981, Williams again underwent treatment, this time involuntary, at the Center. Williams chose the treatment over a jail term for a conviction of indecent exposure earlier that year. Williams' diagnostic report from the 1981 treatment characterized his condition as chronic paranoid schizophrenic. The treatment was terminated by mutual agreement in 1981. Williams became a jailer in early 1984; later that year he was promoted to chief jailer. As chief jailer, Williams was placed in a position of authority over both male and female prisoners. Williams proceeded to oversee jail operations with no more than on-the-job training. Within six months of becoming chief jailer, Williams raped Parker. There is sufficient evidence

the fact that sheriffs are now designated executive officers of the state is not necessarily dispositive of the § 1983 damages question. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616 (1981) ("Court's willingness to recognize certain traditional immunities ... has not led it to conclude that Congress incorporated *all* immunities....."). We know that the financial underpinnings of the sheriff's office are otherwise within the county, which provides compensa-

tion, business expenses, and jail appropriations. In this case there is no question that the county had notice of the suit and opportunity to respond and it is not "obvious" that the state would foot the sheriff's bill. *Brandon v. Holt*, 469 U.S. 464, 472, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). If we could say with "a virtual certainty," *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974), that the damages would be paid from county and not state funds, our holding might be different.

to support a jury finding that sheriff Amerson's hiring and training of Williams caused Parker's constitutional deprivation.

■ To support the finding of municipal liability, sheriff Amerson's responsibility for Parker's injury must be transferrable to the county in that Amerson's hiring of Parker must represent official county policy. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. Sheriff Amerson and Macon County argue that this case is only about a single incident and that a single incident of negligence or misconduct cannot give rise to section 1983 municipal liability. A single incident may, however, be indicative of a policy or practice that can give rise to section 1983 municipal liability. *See, e.g., Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (death resulting from policy of using whatever force was necessary); *Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir.1985) (failure to give medical care because of policy of understaffing). In *Pembaur*, the Supreme Court said that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." 475 U.S. at 480, 106 S.Ct. at 1298. These "appropriate circumstances" are "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483, 106 S.Ct. at 1300.

In this regard, there is substantial evidence to support a jury finding that Amerson hired Williams pursuant to an inadequate employment policy. Sheriff Amerson described his hiring method as based on three criteria: (1) an on-the-job assessment of maturity and ability to do the job—"If he can do it, he can do it. If he can't, after a day or two, of course I will dismiss him, or what have you;" (2) no blindness or loss of arms or limbs; and (3) no speech impediment and knowing how to communicate. Sheriff Amerson testified that he checked with the National Crime Information Center about prior arrests before hiring Williams, but he added that "they didn't call me back so I was under the assumption that there was nothing." This testimony was directly contradicted by testimony from members of Amerson's staff, who stated that Amerson knew about the indecent exposure conviction but brushed it aside as a misdemeanor. Staff also testified that it was not the customary practice to engage in any background check.

Even accepting a finding that sheriff Amerson employed Williams pursuant to a policy of laxity, Macon County cannot be faulted for a policy or an act for which it was not responsible. In defining "those whose acts or edicts may fairly be said to represent official policy," *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, a decisive line was drawn by *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir.1980). Our predecessor Court considered liability against a Texas judge, who:

—like other elected county officials, such as the sheriff and treasurer—holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein. Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.

619 F.2d at 404 (citation omitted); *see also Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir.1980).

The "final authority or ultimate repository" concept has seen repeated invocation by this Circuit.[3] *See, e.g., Williams v. City*

---

**3.** From the common *Familias Unidas* root, the current Fifth Circuit has also had many an opportunity to interpret this phrase. The court in *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir.1982), gave one definition: "When an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy." The en banc Fifth Circuit explained that "[p]olicymakers act in the place of the govern-

*of· Valdosta,* 689 F.2d 964, 969 (11th Cir. 1982) (city liability where city manager had sole authority for city employee demotions). Our application of the *Familias Unidas* strain has been practical and not technical. *See, e.g., Berdin v. Duggan,* 701 F.2d 909, 914 (11th Cir.) ("the evidence otherwise shows that all it took was the mayor to say, 'Get your stuff and go, you are fired,' that is what happened and the city closed him out"), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983); *see also Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) ("If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority on the question."). This functional analysis allows findings of municipal liability where proof is less direct than a "policy statement, ordinance, regulation or decision officially adopted or promulgated by the [governing entity]." *Hearn v. City of Gainesville,* 688 F.2d 1328, 1334 (11th Cir.1982). Although it is not sufficient that an act be undertaken merely on behalf of the governing entity, proof of final authority can be derived from evidence of delegation. *Id.* at 1334.

Our predecessor Court commented in *Schneider v. City of Atlanta,* 628 F.2d at 920 n. 6, that title may indicate the delegation of authority. Since *Schneider,* the full Fifth Circuit decided in *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc on rehearing), that section 1983 liability would arise "as it relates to the officer who obtains policymaking authority by virtue of the office to which that officer is elected." Thus *Bennett* held that an office itself could be sufficient proof of delegation, without needing an express statement

of a city's or county's intent to repose final authority. In this Circuit's most recent application of the *Familias Unidas* principle, title signified final authority. *Lucas v. O'Loughlin,* 831 F.2d 232, 235 (11th Cir. 1987), held that a Florida sheriff was not immune because:

> Although elected by virtue of state law, he was elected to serve the county as sheriff. In that capacity, he had absolute authority over the appointment and control of his deputies. His and their salaries were paid by local taxation and according to a budget approved by the county commissioners. We conclude, therefore, that his act was the act of [the county].

The result in *Lucas* is not, however, immediately applicable to this case. Our separate assessment is needed to the extent that sheriff O'Loughlin was a Florida sheriff, whereas sheriff Amerson is an Alabama sheriff.

For the purpose of section 1983, responsibility on the part of Macon County extends to acts pursuant to county policy, not state policy. Thus central to our functional analysis of the authority by which sheriff Amerson acted is the relationship between the county and the sheriff in this case. In this case the district court directed the jury that, as a matter of law, "Sheriff Amerson was the ultimate authority for Macon County," and that a finding of section 1983 liability for the sheriff would require a finding of liability for the county. For interpretations of state governing structures, we look to state law. *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300. Although the Alabama Supreme Court has spoken in *Parker,* App. A, it does not have the last

---

ing body in the area of their responsibility; they are not supervised except as to the totality of their performance." *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir.1984) (en banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *see also Crane v. Texas,* 766 F.2d 193 (5th Cir.1985) ("responsible for the [ ] policy attacked and conclusively demonstrated his ability to alter it"), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985). *But see Rhode v. Denson,* 776 F.2d 107, 110 (5th Cir. 1985) (constable lacked power to make county policy); *Languirand v. Hayden,* 717 F.2d 220,

227 (5th Cir.1983) (city police chief not ultimate repository of power). Other circuits have been occupied by the issue as well. *Rookard v. Health & Hosp. Corp.,* 710 F.2d 41, 45 (2d Cir. 1983) (county liable for personnel decision of hospital executive director); *McKinley v. City of Eloy,* 705 F.2d 1110, 1116 (9th Cir.1983) (city liable where city had delegated ultimate responsibility to city manager for personnel decisions); *Hays v. Jefferson County,* 668 F.2d 869, 975 (6th Cir.1982) (failure of chief of police or assistant chief would be failure of county).

word in determining whose duty Amerson was implementing when he hired Williams. Amerson's functional role in conducting his personnel policy is of greater interest to us than his technical status as an officer of the state. Returning to the brightline of *Familias Unidas*, the pivotal point is whether Amerson was exercising "county power" with final authority. 619 F.2d at 404.[4]

Every county in Alabama must maintain a county jail. Ala.Code § 11–14–10. More precisely, every county must obtain a site and erect a "suitable" jail. *Id.* at § 11–16–28. Once in place, the county, with its power to tax, must appropriate funds for the jail. *Id.* at § 11–14–20. The county's financial support of the jail encompasses compensation for the sheriff, *id.* at § 11–12–15(a)(2), and reasonable business expenses incurred by the sheriff, *id.* at § 11–12–14. The Alabama board of corrections reports to the county commission as the "body having control over the jail." *id.* at § 14–6–81.

Alabama statute relegates legal custody and charge of the county jail to the county sheriff. *Id.* at § 14–6–1.[5] The sheriff is the caretaker with regard to prison living conditions, *id.* at § 11–14–21. Any prisoners in the county jail are in the sheriff's custody. *Id.* at §§ 11–16–29, 14–6–4. Without formal county endorsement, sheriff Amerson adopted a policy and procedure manual for the Macon County jail in January 1984, which gave detailed guidelines for daily jail operations. Sheriff Amerson had no written hiring policy, and he testified that there was no consistent practice of conducting background checks of potential employees.

In practice, Alabama counties and their sheriffs maintain their county jails in partnership. The county in essence provides the facility and the money for upkeep; the sheriff in essence manages the institution. In this regard, the sheriff makes all hiring and firing decisions in connection with the county jail. Macon County argues that, without supervisory or administrative control over its sheriff, the sheriff has so much control over the jail that the county cannot be liable for his actions.[6] This argument is not supported in section 1983 jurisprudence. By the language of section 1983, it is clear that Congress intended plaintiffs to have recourse against those responsible for constitutional deprivations.

---

**4.** Regardless of the sheriff's duties otherwise, we are looking narrowly at Sheriff Amerson's hiring decisions for the Macon County jail. Once again the Fifth Circuit offers instructive experience. In *Van Ooteghem v. Gray,* 774 F.2d 1332, 1337 (5th Cir.1985), the Fifth Circuit applied *Familias Unidas* to hold that a Texas treasurer could be liable under § 1983 because his decisions fell "on the local not state side of his duty; he was about the business of county government.... Whatever state duties a County Treasurer may have, we are persuaded that in the personnel matters at issue here, Gray was wearing his county hat." 774 F.2d at 1337.

**5.** Section 14–6–1 reads in full: "The sheriff has the legal custody and charge of the jail in his county and all prisoners committed thereto, except in cases otherwise provided by law, and may appoint a jailer for whose acts he is civilly responsible." This statute was found unconstitutional by the Alabama Supreme Court only "[t]o the extent that it purports to impose civil liability on a sheriff for the acts of a jailer appointed by the sheriff." *Parker v. Amerson,* 519 So.2d at 446.

**6.** We separate ourselves from those district courts that have made control the controlling factor and have thus concluded that sheriffs and

counties are more separable than joint. In one case, a district court dismissed claims against a county for actions of its elected sheriff because "the county board has no power to supervise, direct or control the actions of the Sheriff in the operation of the jail." *Thomas v. Talesky,* 554 F.Supp. 1377, 1378 (N.D.Ill.1983). Substantiating the position with the observation that "under Illinois law, the Sheriff is an independent, elected official," the same result was reached in *Baltz v. County of Will,* 609 F.Supp. 992 (N.D.Ill. 1985). In part because the Michigan constitution states that "[t]he county shall never be responsible for [acts of the sheriff]," the court in *Kroes v. Smith,* 540 F.Supp. 1295 (E.D.Mich. 1982), denied § 1983 liability against a county for acts of a sheriff.

Instead, we align ourselves with the view that sheriffs and counties are more joint than separable. *See, e.g., Marchese v. Lucas,* 758 F.2d 181, 189 (6th Cir.1985) ("relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers and his ratification of the use of wanton brutality by members of his force").

We will not add qualifications where Congress has not specified them.

In the absence of expressly contrary delineations of state authority, this Circuit has taken the position that the county, not the state, starts with responsibility for running its county jails. *Lucas,* 831 F.2d at 235. An Alabama county is vested with such primary responsibility through its duty to maintain and control its jail. Ala. Code §§ 11–14–10, 14–6–81, 14–6–82. Therefore the sheriff's authority in managing the county jail is necessarily a delegation by the county of final authority for a county function. Where the county has had an obligation, this Circuit has placed liability. *See, e.g., Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir. 1985) (county obligation to provide medical care for incarcerated individuals). Although the county's authority to provide may be delegable, the county's duty to provide a service is non-delegable. *Id.* at 705. Sheriff Amerson operated the county jail on behalf of Macon County, not in his own or in the state's stead.

The Fifth Circuit's reasoning in *Crane v. Texas,* 766 F.2d 193 (5th Cir.1985), is instructive for this case. In *Crane,* the Fifth Circuit noted that a Texas district attorney has the attributes of both a state official and a county official. But in sum, the court concluded, "much like the county itself, his office is a local entity, created by the State of Texas and deriving its powers from those of the State, but limited in the exercise of those powers to the county, filled by its voters, and paid for with its

funds." *Id.* at 195. There is little in this description to distinguish the Texas district attorney from the Alabama sheriff. The *Crane* holding provides a persuasive argument for this case: "[E]ven were he a State official in every sense, called so in State law and designated by the State to make policy for its other creature, the county, our answer would likely remain the same; county responsibility for violation of the Constitution cannot be evaded by such ingenious arrangements." *Id.*

■ At the end of this arduous trail, during which we have concluded that the jury would have been justified in finding that Amerson acted pursuant to an inadequate policy and that this policy could have been fairly ascribed to Macon County, the final permutation is whether gross negligence in hiring Williams would have supported county liability. Given the instructions received by the jury, we must evaluate the possibility that the jury based its verdict on this finding alone. Grossly negligent or deliberately indifferent acts serving as a basis for section 1983 liability must be traceable to a policy or custom.[7] A single incident of grossly negligent hiring without more does not constitute official policy. *City of St. Louis v. Praprotnik,* —— U.S. —— at ——, 108 S.Ct. 915 at 922, 99 L.Ed.2d 107 (1988).

A jury finding of specific gross negligence in this case would, however, have evidenced a more general finding of gross negligence. Considering the facts of this case, we conclude that Amerson's decision

---

7. *See, e.g., Owens v. City of Atlanta,* 780 F.2d 1564, 1568 (11th Cir.1986) (no evidence of previous misuse of restraining device); *Anderson v. City of Atlanta,* 778 F.2d 678, 680 (11th Cir.1985) (death as natural consequence of practice of inadequate staffing); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442–43 (11th Cir.1985) (policy of inadequate training or negligent hiring sufficient to state claim); *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 706 (11th Cir. 1985) (deliberate indifference regarding policy requiring inmates to seek court orders to obtain medical services); *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir.1985) (gross deficiencies and deliberate indifference regarding policy of admitting to jail and handling unconscious persons suspected of intoxication); *Languirand v. Hayden,* 717 F.2d 220, 227 (5th Cir.

1983) (gross negligence regarding widespread misbehavior of police force or pattern of incidents). *But see McKinley v. City of Eloy,* 705 F.2d 1110, 1117 (9th Cir.1983) (section 1983 has no requirement of finding general policy; specific policy against one individual suffices).

A number of cases have, however, considered only if the actor had the final authority on behalf of the governing entity. Implicit in these holdings is that the delegation of authority was itself the official policy, and that no more specific policy or custom needed to be ascertained. *See, e.g., Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984); *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982); *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980). Our holding in this case does not require us to agree or disagree with this interpretation of section 1983.

to hire Williams was a reflection of the broader employment scheme, or lack thereof, and should not be considered in isolation on review. Because Amerson hired Williams consistent with his general hiring methodology—his testimony even indicated a higher scrutiny than usual, a finding of gross negligence in this case would have reflected gross negligence across-the-board. We conclude that in any case the jury verdict is traceable to a policy or custom.

As a final codicil, the fact that sheriff Amerson benefits from Eleventh Amendment immunity to liability in his official capacity does not bear on the vulnerability of Macon County to be sued in this case. By statute, Macon County has the power to sue or be sued. Ala.Code § 11–1–2; *Cook v. County of St. Clair*, 384 So.2d 1 (Ala. 1980). Liability of the governing entity is not contingent on the liability of the party enacting government policy. Although an individual defendant may be shielded by state immunity or by good faith immunity, nothing in section 1983 keeps a court from tracing the causal link even through an immune party to reach a responsible governing entity. *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir.1985).

### B. Sheriff Amerson's Section 1983 Liability

■ Sheriff Amerson in his official capacity is immune from suit. *Parker*, 519 So.2d at 443. This immunity does not extend to the sheriff's individual capacity; however, Amerson seeks to raise "[q]ualified immunity—the objective 'good faith' defense." *Lundgren v. McDaniel*, 814 F.2d 600, 604 (11th Cir.1987). Sheriff Amerson requested a jury charge on the good faith defense. The district court refused the instruction, and the sheriff alleges that this was reversible error.

Qualified immunity is normally a threshold issue. Most recently in *Anderson v. Creighton*, —— U.S. ——, ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), the Supreme Court reiterated and clarified that a court considering a summary judgment must look for the " 'objective legal reason-

ableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." Sheriff Amerson misapprehends the nature of qualified immunity for section 1983 claims against individuals.

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), adopted a purely objective standard of qualified immunity. There is an acknowledged degree of fact specificity within the objective legal reasonableness standard, *Anderson*, —— U.S. at ——, 107 S.Ct. at 3038, but the determination is factual only as to those circumstances of the particular case needed to decide whether any clearly established law was applicable. It is the rare case where applicable law turns on extraordinary circumstances requiring jury resolution. Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation*, 95 Yale L.J. 126, 145 n. 74 (1985). By refusing to instruct the jury, the district court in essence held that, based on undisputed factual circumstances, Sheriff Amerson's actions were legally unreasonable.

In a post-trial order, the district court reasoned that

> [b]ecause defendant Amerson's individual liability under Section 1983 was based on either (1) his own creation of an official policy or custom of not performing reasonable background checks on potential jailers at the Macon County jail or (2) his gross negligence in hiring and retaining James Michael Williams as chief jailer when he knew or should have known that James Michael Williams was a convicted sex offender with various psychiatric problems, this Court determined that there is no basis for a good faith defense.

By ascertaining the legal unreasonableness of the inadequate hiring policy or the improvident hiring decision, the district court determined that a good faith defense was unavailable on the two theories of sheriff liability before the jury.

Defendants do not argue, nor do we discern, exceptional factual circumstances

that needed jury resolution for the objective assessment in this case. The district court found that sheriff Amerson "did not require the most minimal background check of persons before hiring them as jailers." The district court also found that "[i]f there was any issue at the trial that was supported by sufficient evidence, it was the issue of whether sheriff Amerson knew of Williams' criminal record and ignored such information in placing him in the position of the chief jailer." These findings are not clearly erroneous, but neither are they pivotal. The determination of the objective legal reasonableness of sheriff Amerson's actions does not turn on the disputed fact of whether sheriff Amerson did a background check of Williams or whether he knew of Williams' incriminatory past before hiring him or promoting him to chief jailer.

In denying the good faith defense, the district court in effect concluded that either Amerson did not conduct background checks and should have, or Amerson did have information from a background check or otherwise and failed to reject Williams but should have. Williams' record is not disputed. Williams had been convicted of indecent exposure. Williams was consequently precluded from attending police academy and becoming a law enforcement officer. Williams had undergone mental treatment for memory lapses, talking to himself, and multiple personality experiences. The district court was not amiss to hold that this history sufficed to make sheriff Amerson's hiring of Williams as chief jailer objectively legally unreasonable. No additional evidence offered by defendants would have altered the objective assessment or could have supported a jury finding in favor of sheriff Amerson. There would have been no reasonable grounds, based on established principles of law, for the sheriff to believe that hiring as chief jailer a convicted sex offender with a history of mental problems was a permissible action.

8. In a subsequent pre-trial order, the district court also rejected as irrelevant evidence regarding Parker's sex life, life style, and prior

Sheriff Amerson also argues in his defense that Williams was off-duty when the rape occurred and therefore was not committing an act under the color of state law. This argument gives the color of state law requirement an overly technical meaning. In *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), the Supreme Court defined color of state law acts as "misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." There is no real dispute in this case that Parker's rape was made possible because Williams used his official authority first to have access to and leverage over Parker in jail, second to obtain bond for her release, third to pursue Parker and "revoke" her bond, and fourth to force her return to the jail via his apartment. Williams' official posture was substantiated throughout by the flaunting of his uniform, gun, and badge.

III.  Other Issues

A.  Collateral Estoppel

■  Sheriff Amerson attempted to enter evidence at trial showing that there was no physical violence during the rape and that there was voluntary sexual foreplay leading up to the rape. Based on collateral estoppel and lack of relevance, the district court refused to admit this evidence regarding the immediate circumstances of the rape.[8] The district court reasoned that Williams' criminal conviction in Alabama state court in 1984 for kidnapping and rape collaterally estopped defendants from relitigating the rape itself.

The Supreme Court approved the use of offensive collateral estoppel in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), as a matter of broad discretion for the trial court. *See also Martin v. Reed*, 480 So.2d 1180 (Ala.1985). Appellants argue that offensive collateral estoppel is inappropriate where the parties in the two judicial proceedings are neither the same nor in privi-

contact with Williams. This order is not challenged on appeal.

ty. Williams alone was the defendant in his criminal conviction, and sheriff Amerson and Macon County are added as defendants in this civil suit.

The full mutuality of parties was abandoned as an estoppel requirement in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). *Blonder-Tongue* instead posed the issue only as a matter of fairness. 439 U.S. at 331, 99 S.Ct. at 651. As a general rule, however, Alabama still requires identity or privity of parties as a precondition for collateral estoppel.[9] Thus as a threshold question we must determine whether state or federal law prescribes the use of collateral estoppel in this case.

Williams pleaded not guilty to his criminal charges and therefore received the benefit of a full jury trial. In *Allen v. McCurry,* 449 U.S. 90, 102, 101 S.Ct. 411, 419, 66 L.Ed.2d 308 (1980), the Supreme Court approved of the fact that "every Court of Appeals that has squarely decided the question has held that collateral estoppel applies when § 1983 plaintiffs attempt to relitigate in federal court issues decided against them in state criminal proceedings." The Supreme Court subsequently repeated the holding in *Allen* that "§ 1983 did not open the way to relitigation of an issue that had been determined in a state criminal proceeding." *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 84, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984).

*Migra,* however, went on to hold that section 1983 suits do not "override state preclusion law." *Id.* at 85, 104 S.Ct. at 898.

*Migra* would thus seem to point this Court in conflicting directions. Although *Allen* and *Migra* reached consistent results based on the facts of those two cases, the facts in this case differ sufficiently to make neither case completely applicable. *Allen* was not concerned with the identity or privity of parties; *Migra* was not concerned with a party seeking to recognize a state court judgment. As to the facts of this case, if we apply the *Migra* holding, we must violate the *Allen* holding, and vice versa. Therefore, we look to the principles that gave rise to the *Migra* holding so as to understand its applicability to this case.

*Migra* was concerned that courts considering section 1983 suits would give too little full faith and credit to state court judgments. In this case the argument seems to be that we would be giving too much faith and credit were we to approve the collateral estoppel. Rigid adherence to Alabama collateral estoppel requirements in this case would not so much "create[ ] an exception to the general preclusive effect accorded state-court judgments" as undermine the recognition of a fully and fairly litigated state court judgment.[10] Therefore, the rationale behind *Migra*'s holding points in the direction of allowing the use of collateral estoppel in this case.

**9.** The boilerplate statement of Alabama collateral estoppel comes from *Wheeler v. First Alabama Bk. of Birmingham,* 364 So.2d 1190, 1199 (Ala.1978) (citations omitted):

Collateral estoppel operates where the subsequent suit between the same parties is not on the same cause of action. Requirements for collateral estoppel to operate are (1) issue identical to one involved in the previous suit; (2) issue actually litigated in prior action; and (3) resolution of the issue was necessary to the prior judgment. If these elements are present, the prior judgment is conclusive in the prior suit.

**10.** Regarding fairness, it is significant that the Supreme Court cautioned in *Parklane* that collateral estoppel should not apply where procedural opportunities that were unavailable at the earlier proceedings would have been available

at the later proceedings. In this case, the reverse is true. As this Circuit noted in *In the Matter of Raiford,* 695 F.2d 521, 523 (11th Cir. 1983) (citations omitted):

The use of a criminal conviction as conclusive of an issue in a subsequent civil litigation, though not universally accepted, is well established today. Because the complainant's standard of proof is higher, and greater procedural protections attach in a criminal prosecution, a conviction is a sufficiently reliable determination of the relevant issue.

Williams, as the beneficiary of a presumption of innocence, with probably the greatest interest of any party in defending against the criminal charges of rape, and found guilty beyond a reasonable doubt, had a "full and fair opportunity to litigate the claim or issue decided by the first court." *Allen,* 449 U.S. at 101, 101 S.Ct. at 418.

There is another guidepost that points the way. The Supreme Court in *Burt v. Union Central Life Ins.*, 187 U.S. 362, 23 S.Ct. 139, 47 L.Ed. 216 (1902), essentially held that a judgment of conviction is conclusive of the fact of the conviction when, in a civil action, the issue relates to the fact of the judgment and not to the existence of the facts upon which the defendant was convicted. Alabama first recognized this rule in *Fidelity-Phenix Fire Ins. v. Murphy*, 226 Ala. 226, 146 So. 387, 392 (1933). Thus the conflicting strands of state and federal preclusion law in fact converge. At least as far as the elements of Alabama rape, collateral estoppel was properly invoked by the district court. *Cf. Wolfson v. Baker*, 623 F.2d 1074, 1078 (5th Cir.1980) (collateral estoppel requires determination of what was necessarily decided by prior criminal conviction), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981).

First degree rape in Alabama occurs when a male "engages in sexual intercourse with a female by forcible compulsion." Ala.Code § 13A–6–61(a)(1). Obviously Williams' first degree rape conviction necessarily determined that Williams raped Parker: the fact of the conviction. Section 1983 liability in this case rested on the fact that Williams committed the rape and on determinations that sheriff Amerson and Macon County were causally linked to and responsible for the rape. These latter determinations hinged only on the fact of

conviction, not on the degree of force or consent regarding the rape. No valid defense to the causation and fault requirements of section 1983 turned on the rape details. Therefore, as to the determination of civil liability, the conviction was conclusive and the particulars of the rape were irrelevant.

The jury's award of compensatory damages followed from the finding of liability and was not undermined by the offensive use of collateral estoppel. Once the jury found liability predicated on the undisputed fact of rape, Parker was entitled to compensation. *Mays v. Pico Finance Co.*, 339 So.2d 382 (La.App.1976) (court required damages where jury found rape occurred but then denied recovery).[11]

Compensation is focused on the victim; the victim is to be compensated for her damage or injury. The way in which a rape victim presents herself in the immediate context of a rape may be more misleading than helpful in measuring compensatory damages done by the violation. A more reliable, and a sufficient, gauge of injury is the extent of trauma, disorientation, and inhibition coming as after-effects of the rape.

The jury was presented with evidence of the effects of the rape on Parker. *Byfield v. Candler*, 33 Ga.App. 275, 125 S.E. 905 (1924).[12] The injury to Parker was fully ascertainable from the sustained impact of the rape without delving into the details of

11. Sheriff Amerson and Macon County each raise an additional challenge to the compensatory award. Sheriff Amerson challenges the format of the verdict form. The jury form requested a check mark beside each of the three defendants against whom the jury wished to award compensatory damages. Amerson's complaint is that there should have been an additional question allowing the jury to return a verdict in his favor. The sheriff's argument that the jury had an opportunity to indicate liability without an opportunity to indicate lack of liability ignores the fact that no check meant no liability. This is certainly not a complicated concept for any jury. That this jury understood the concept is clear from its decision not to place a check beside Williams' name under the punitive damages question.

Macon County challenges the compensatory damages award on grounds of excessiveness because Parker would have incurred only $17,000

for psychotherapy. As instructed, the jury was entitled to compensate Parker for physical, mental, and emotional harm, for lost earnings, for reasonable medical care, and for the violation of her constitutional rights. The award of $100,000 does not shock the conscience of this Court. *Goldstein v. Manhattan Indus.*, 758 F.2d 1435, 1447 (11th Cir.1985).

12. We have found one case that denied recovery because the plaintiff failed to meet her burden of showing that the intercourse was accomplished by force, *Kirkwood v. McFarland*, 47 So.2d 74 (La.App.1950). This case is clearly distinguishable. In *Kirkwood*, force and consent were contested and tried for the first time. In this case force was undisputed. Because force is an essential element of Alabama rape, the use of force by Williams against Parker was necessarily determined in the criminal conviction.

the rape itself. Collateral estoppel as to the fact of the rape itself did nothing to undermine the award of compensatory damages.

As to the determination of punitive damages, however, the definition of rape in Alabama gives us some pause. Force in the context of rape in Alabama can be either actual (physical) or constructive (duress or fear). *McQuirk v. State*, 84 Ala. 435, 4 So. 775 (1888). Williams' criminal conviction, therefore, did not determine the type of force, nor the degree of force, used against Parker. To the extent that defendants' attempted to raise these details in a manner relevant to their defense, the use of offensive collateral estoppel in this case may have gone too far.

Punitive damages against Williams would have been predicated on a finding of malice.[13] Arguably, the degree of force used would have been an indication of malicious behavior and therefore would have been relevant to an award of punitive damages against Williams. *See, e.g., Gaither v. Meacham*, 214 Ala. 343, 108 So. 2 (1926). However, because the jury refrained from awarding punitive damages against Williams, any error from the excluded evidence would at most have been harmless as to Williams.[14]

As to Macon County, any error would at most have been harmless as well. The jury verdict form instructed the jury that "if you find against Sheriff Amerson and Macon County, Alabama only on the Federal Claims, then you cannot award punitive damages on the Federal Claims against Macon County, Alabama." The jury assessed punitive damages against Macon County because it found liability on both the state and the federal claims. Now that

Macon County has been absolved from the state claims, Macon County's liability must necessarily be restricted to compensatory damages. The law is that "[a] municipality is immune from punitive damages under 42 U.S.C. § 1983." *Newport v. Fact Concert, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Therefore the collateral estoppel issue has no bearing on Macon County's punitive damage liability.

That leaves sheriff Amerson, who is liable only in his individual capacity. Punitive damages in section 1983 suits may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). By awarding punitive damages against sheriff Amerson, the jury, in accordance with its charge, necessarily found that he acted either with malice or with wantonness. Malice would have been an unlikely finding because the sheriff was not directly involved in the rape. There is, however, sufficient, indeed ample, evidence to support a jury finding that sheriff Amerson was wanton in hiring Williams as chief jailer. Details of the immediate circumstances of the rape would have had no bearing on such a finding of wantonness. Given that Parker's federal suit against sheriff Amerson in his individual capacity is preserved, his liability as to punitive damages attaches and is preserved as well.

### B. Expert Testimony

■ According to Macon County and sheriff Amerson, Dr. George Beto, an expert in the field of correctional facilities

---

**13.** The jury did not receive separate instructions on punitive damages under the state and federal claims, but was generally instructed that "[t]he function of punitive damages is to punish the Defendant for malicious conduct, and to deter similar conduct by others. Whether you decide to award any punitive damages in this case should be based on whether you find that a Defendant has acted with malice or wantonness."

**14.** Sheriff Amerson and Macon County argue on another front that without punitive damages

against Williams, they cannot be held punitively liable. This Circuit has no all-or-nothing rule disallowing a selective jury apportionment of punitive damages for federal claims. Moreover, the jury reasonably could have concluded that punitive damages would have been inappropriate against Williams given his mental history and criminal conviction, but that punitive damages would have been fitting against the responsible policy making and governing entities, particularly for the sake of deterrence.

called by Parker, overstepped the bounds of Federal Rule of Evidence 704. Rule 704 states that "testimony in the form of an opinion or inference otherwise inadmissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." An admissible opinion on an ultimate issue of fact is, however, not the same as an opinion constituting a legal conclusion, which is inadmissible. *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir.1977); *see also Matthews v. Ashland Chemical, Inc.*, 770 F.2d 1303, 1311 (5th Cir.1985).

Dr. Beto was asked by Parker's attorney: "Do you have an opinion about whether [Williams] being employed by the Macon County Jail as Chief Jailer is grossly negligent or not?" Dr. Beto answered: "Consider it grossly negligent." At the close of trial, the jury was instructed that:

> If you find from a preponderance of the evidence in the case that Plaintiff has proved her claim that Sheriff Lucius Amerson was grossly negligent in employing James Michael Williams as a jailer in Macon County jail, and that Sheriff Amerson's gross negligence was a proximate cause of the alleged deprivation of Plaintiff's constitutional rights by James Michael Williams, ..., your verdict must be for the Plaintiff against Defendant Macon County and Lucius Amerson.

At the very least, Dr. Beto's expert response comes uncomfortably close to the ultimate question of liability before the jury.

This Court considered the strictures required by Rule 704 in *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467 (11th Cir. 1984). In that medical malpractice case, the Court upheld the exclusion of an expert opinion that the doctor was negligent. Emphasizing that Rule 704 should not be applied in a vacuum, the Court stated that "to be admissible under Rule 704 an expert's opinion on an ultimate issue must be helpful to the jury and also must be based on adequately explored legal criteria." *Id.* at 1474.

This is a close question, but we recognize that Rule 704 accords the trial court wide discretion in admitting expert testimony. Fed.R.Evid. 704 Advisory Committee Notes. We note that the district court instructed the jury as to the proper weight to be given to expert testimony.[15] Similar instruction prompted this Court to accept challenged expert testimony in *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. Unit B 1981); *see also Slakan v. Porter*, 737 F.2d 368, 378 (4th Cir.1984). We also note that the district court extensively instructed the jury on the legal meaning of gross negligence.[16] These instructions make it difficult to conclude that Dr. Beto's opinion was "phrased in terms of inadequately explored legal criteria." Fed.R. Evid. 704 Advisory Committee Notes. And although a legal term of art, "gross negli-

---

**15.** "Now, you should consider each expert opinion received in evidence in this case and give it such weight as it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion of the expert are not sound, or that the opinion is not weighed by other evidence, then you may disregard the opinion of any expert totally."

**16.** "You may find that Defendants Sheriff Amerson and Macon County are liable to Plaintiff on her federal claim of gross negligence if you find each of the following to exist: One, that Sheriff Amerson was grossly negligent in hiring and retaining James Michael Williams as a jailer at the Macon County jail. In this regard, gross negligence is more than mere negligence, and means a callus [sic] indifference or disregard for the consequences of ones [sic] act or failure to act. Two, that Sheriff Amerson acted under the color of state law which [sic] he committed such gross negligence. And three, that Sheriff Amerson's gross negligence, if any, was a proximate or legal cause of the rape of Plaintiff by James Michael Williams. Those are the three conditions which must be present before the sheriff could be liable, and Macon County liable, under the gross negligence contention of the Section 1983 claim.

Now, such gross negligence is a proximate or legal cause of damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such damage. So it can reasonably be said that except for the gross negligence, the injury or damage would not have occurred. Gross negligence may be a proximate or legal cause of damage, even though it operates in combination with the act of another, if such gross negligence contributes substantially to producing such damage."

gence" is not exclusively a legal conclusion; it also encompasses a finding of ultimate fact. Finally, we note that, exclusive of Dr. Beto's statement, there was considerable evidence tending to show that Williams was hired out of gross negligence. Even if the court's failure to sustain the objection was in error, we are not convinced that ruling affected the substantial rights of the defendants. Fed.R.Civ.P. 61. Considering "the testimony in its context, the complexity of the case, and the correctness of the witness' statement," *Fogg*, 652 F.2d at 557, we conclude that admission of the statement is not reversible error.

■ Macon County additionally claims that Dr. Beto's testimony that Williams' mental disorder was likely to recur was outside Dr. Beto's scope of expertise and should have been disallowed. It does appear that this testimony was not strictly a matter for an expert on correctional facilities, but we conclude that any error was harmless. The same testimony was given by Dr. Carol Skelton, a psychologist who testified on paranoid schizophrenia. Similarly, Macon County's objections to statements by Dr. Beto that Williams was "totally unfit" as chief jailer and that Amerson's hiring practices were "totally inadequate" do not constitute reversible error.

### C. Attorneys' fees

■ Finally, on consolidated appeal, Macon County and sheriff Amerson raise the issue of attorneys' fees. The district court awarded $74,000 to Parker for attorneys' fees pursuant to 42 U.S.C.A. § 1988. Appellants' arguments are that the fee award is disproportionately large compared to the damages award and that the fee award is excessive under the factors considered by this Circuit. A district court's determination of reasonable attorneys fee will be disturbed only upon a showing of abuse of discretion. *Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir.1983).

As to appellants' first argument, in *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), the Supreme Court specifically held that fee awards under section 1988 need not be proportionate to the amount of damages recovered. As to appellants' second argument, the three plaintiffs' lawyers requested fees covering a total of 1,244.15 hours of work at $125 and $95 per hour. The amount was rejected as excessive on the basis of the factors enunciated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974). The district court gave each factor careful consideration, and it is clear that the district court did not abuse its discretion in ordering a fee award covering 740 hours of work at $100 per hour. Because Parker remains a prevailing party as to each defendant against whom attorneys' fees were awarded, the district court's fee award is upheld in full.

### IV. CONCLUSION

In sum, we affirm the jury verdict as to Macon County's liability under section 1983 and sheriff Amerson's liability in his individual capacity under section 1983. Because Williams is liable on the state claim, all three defendants remain jointly liable for the award of compensatory damages. Because Macon County is not liable for punitive damages, only sheriff Amerson remains liable for the award of punitive damages. Finally, the district court's award of attorneys' fees is affirmed.

HILL, Circuit Judge, dissenting:

While I agree with the bulk of the majority's opinion in this case, I disagree with the resolution of the collateral estoppel issue in part III A. of the opinion. Because I believe that the district court committed reversible error in ruling that the defendants were estopped from offering evidence on a central issue, I must dissent.

As the majority notes, the case law approves of offensive and nonmutual collateral estoppel, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed. 2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and principles of collateral estoppel apply in section 1983 cases. *See Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Migra v. Warren City*

*School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The case law does not, however, permit estoppel of a party who has never litigated the relevant issue:

> Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.

*Blonder-Tongue,* 402 U.S. at 329, 91 S.Ct. at 1443. While Williams may be nonmutually and offensively estopped by his criminal conviction from relitigating the rape issues, neither Amerson nor the County, who have never addressed the matter previously, may be estopped by Williams' criminal trial.

The majority states that "[s]ection 1983 liability in this case rested on the fact that Williams committed the rape...." Majority Op. at 775. I believe that Amerson and the county are entitled to a day in court on the question of whether Williams committed the rape. They would, of course, be unable to challenge the fact that Williams was convicted of rape, but the fact of conviction is distinct from the facts underlying the conviction. That is the distinction recognized in *Burt v. Union Central Life Ins.,* 187 U.S. 362, 23 S.Ct. 139, 47 L.Ed. 216 (1902) and *Fidelity-Phenix Fire Ins. v. Murphy,* 226 Ala. 226, 146 So. 387 (1933). In those civil cases, liability turned on the fact of the conviction, while here liability turns on the underlying facts. The plaintiff does not claim to have been injured by Williams' conviction for rape, but by his commission of rape. While Williams' conviction precludes him from relitigating the question of whether he committed the rape, the conviction does not preclude Amerson or the County.

Given my conclusion that the district court's ruling wrongly precluded the Sheriff and the County from offering evidence on the central question of whether Williams raped the plaintiff, I would reverse the judgment entered against those two defendants.